RENDERED: AUGUST 18, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0306-MR

JACKIE W. JEROME III                           APPELLANT

ON APPEAL FROM GRAVES CIRCUIT COURT
V.        HONORABLE JOSEPH W. CASTLEN, III, SPECIAL JUDGE
NO. 20-CR-00098

COMMONWEALTH OF KENTUCKY            APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING IN PART, VACATING IN PART, AND REMANDING</u>**

Jackie Jerome (Jackie) appeals from his convictions for burglary in the first degree, rape in the first degree, kidnapping, violation of an EPO/DVO, and terroristic threatening. We affirm those convictions. However, because the trial court failed to sufficiently inquire into a deliberating juror's potential partiality or unfairness before excusing her, we vacate Jackie's sentence and remand to the trial court.

## I. BACKGROUND

Jackie Jerome married Tara Jerome (Tara) in 2012. In 2017, Jackie and Tara moved to Mayfield, Kentucky. In November 2019, Tara and Jackie separated. Tara sought an emergency protective order (EPO/DVO) against Jackie. The Graves County District Court found that Jackie committed an act of domestic violence and issued a no contact order to last three years. Jackie

was ordered to stay at least 500 feet away from Tara, her home, and her work. Jackie retained visitation rights with their two young children.

On Friday, March 20, 2020, Jackie's mother picked the two children up from Tara's house and brought them to Jackie's house for the weekend. That evening, Tara and her 16-year-old son from a different marriage slept at Tara's home. Tara slept on the recliner in the living room. Her son and dog slept in a room down the hall.

On Saturday, March 21, 2020, Tara woke up from her 6:15 A.M. alarm. At that moment, Jackie burst through the interior basement door and into the living room where Tara was sitting. According to Tara's testimony at trial, he entered the basement through a cellar door and stayed the night there. When he entered the living room, he pointed a gun at Tara. Tara screamed, and Jackie told her to shut up or he would kill her.[1] He then forced Tara to her bedroom and pushed her onto her bed. He pulled down her pants, took out her tampon, and placed the gun on the bed. He then began to rape her. Tara asked him to move the gun, so Jackie placed the gun on the side table. He continued to rape her. Once Jackie was finished, Tara went to the bathroom to clean herself up. Jackie followed her to the bathroom with the gun and a bag of bullets in his hand.

After cleaning up, Jackie ordered Tara to get into the driver's seat of her car. With the gun on his lap, Jackie directed Tara where to drive. They stopped

---

[1] Tara's son testified at trial that neither he nor the dog woke up despite the noise from Jackie's entrance and Tara's scream.

at a church, and then Jackie made Tara drive them to his co-worker Michael Staples's (Staples) house. Staples had lent the gun to Jackie the day before. Staples testified at trial that Jackie asked him to borrow a gun and that, to his knowledge, the gun worked and had bullets. Jackie returned the pistol to Staples.

Next, Tara and Jackie drove to a gas station. After, Jackie and Tara went to pick up their children. Jackie then made Tara drive him to his own car. Jackie followed Tara and the children back to Tara's house, where he entered the house behind Tara, hugged her, and eventually left the house.

Once Tara watched Jackie drive away, she called 911. An investigation ensued. As a result, Jackie was indicted for first-degree burglary, first-degree rape, kidnapping, possession of a handgun by a convicted felon, violation of an EPO/DVO, and terroristic threatening. Prior to trial, Jackie pled guilty to possession of a handgun by a convicted felon. He proceeded to trial on all other offenses. At the close of evidence, Jackie tendered jury instructions, including one for burglary in the third degree, which was excluded from the given instructions. The jury found Jackie guilty of first-degree burglary, first-degree rape, third-degree terroristic threatening, violation of an EPO/DVO, and kidnapping.

During penalty phase deliberations, Juror 8 informed the bailiff she no longer wanted to deliberate. The judge, defense counsel, Commonwealth's Attorney, and Juror 8 met to discuss the situation. Both the Commonwealth and defense objected to the excusal of Juror 8. The judge overruled both

3

objections and excused the juror. The judge then gave Jackie two options to proceed. Jackie could either (1) waive his right to a 12-person jury and allow an 11-person jury to decide his sentence, or (2) allow the judge to make the sentencing decision. Jackie objected to 11 jurors, leaving the judge to decide the sentence.

On July 19, 2021, the judge sentenced Jackie to 10 years for burglary in the first degree, 15 years for rape in the first degree, 15 years for kidnapping, 12 months for terroristic threating, 12 months for violation of EPO/DVO, and 6 years for possession of a handgun by a convicted felon. The trial court ordered the sentences to run partially concurrently and partially consecutively for a total of 30 years. Jackie then appealed to this Court.

## II. ANALYSIS

On appeal to this Court, Jackie argues the trial court made two reversible errors. First, he argues that the trial court erred in failing to instruct the jury on the lesser included offense of burglary in the third degree. Second, he argues that the trial court erred in dismissing Juror 8 during penalty phase deliberations and then deciding on its own Jackie's sentence. We address each argument in turn.

### A. Jury Instructions

Jackie argues that the trial court erred in failing to instruct the jury on the offense of burglary in the third degree as a lesser included offense of burglary in the first degree. He contends that the jury could have disbelieved the testimony that he was armed with a gun when he burglarized Tara's house.

4

He asserts that this argument was preserved by his submission of proposed jury instructions that included an instruction for burglary in the third degree.

The Commonwealth, by contrast, claims that the above argument was not preserved because, despite his proposed jury instructions, Jackie did not explicitly and specifically object to the trial court's failure to give a burglary in the third degree instruction during the parties' arguments regarding instructions. The Commonwealth further argues that even if this argument is preserved, the trial court did not err in failing to give the desired instruction because no evidence was admitted supporting it.

A review of the trial court record reveals that Jackie submitted proposed jury instructions that included burglary in the third degree as a lesser included offense of burglary in the first degree. Although Jackie did not specifically object to the trial court's failure to instruct the jury on the offense of burglary in the third degree, he did generally object to the trial court's refusal to use his proposed jury instructions and to its failure to instruct the jury on "other lesser included" offenses.

Kentucky Rule of Criminal Procedure (RCr) 9.54(2) states as follows:

> No party may assign as error the giving or the failure to give an instruction unless the party's position has been fairly and adequately presented to the trial judge by an offered instruction *or* by motion, *or* unless the party makes objection before the court instructs the jury, stating specifically the matter to which the party objects and the ground or grounds of the objection.

(Emphasis added). Under the plain language of the rule, a party can preserve his objection to jury instructions in one of three alternative ways: (1) by offering

5

an instruction; (2) by motion; or (3) by making a specific objection before the court instructs the jury. *Id.* The rule does not require any additional objection or filing so long as one of these three is satisfied. In the past, this Court has held that an argument regarding the failure to give a certain jury instruction is preserved by the party's tendering of the requested instruction to the trial court without requiring anything more. *E.g., Elery v. Commonwealth*, 368 S.W.3d 78, 89 (Ky. 2012). By submitting a proposed instruction for burglary in the third degree, Jackie adequately preserved the issue for this Court's review.

"It is always the duty of a trial court to instruct a jury on lesser included offenses when it is so requested and *it is justified by the evidence.*" *Martin v. Commonwealth*, 571 S.W.2d 613, 615 (Ky. 1978) (emphasis added). We have emphasized that a defendant "'is entitled to an instruction on any lawful defense which he has,' . . . including instructions on lesser included offenses." *Allen v. Commonwealth*, 338 S.W.3d 252, 255 (Ky. 2011) (quoting *Hudson v. Commonwealth*, 202 S.W.3d 17, 20 (Ky. 2006)). However, "[a]n instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense." *Hudson v. Commonwealth*, 385 S.W.3d 411, 416 (Ky. 2012) (quoting *Houston v. Commonwealth*, 975 S.W.2d 925, 929 (Ky. 1998)) (internal quotation marks omitted).

We review the trial court's refusal to give a specific jury instruction for an abuse of discretion. *Sargent v. Schaffer*, 467 S.W.3d 198, 204 (Ky. 2015),

*overruled on other grounds by Univ. Med. Ctr. v. Shwab*, 628 S.W.3d 112 (Ky. 2021). A trial court abuses its discretion only when its decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principals." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citations omitted). In employing this standard of review to the failure to instruct the jury on a lesser included offense, we ask "whether a reasonable juror could acquit of the greater charge but convict of the lesser." *Allen*, 338 S.W.3d at 255 (citations omitted). To answer this question, we "consider[] the evidence favorably to the proponent of the instruction." *Id.* (citations omitted).

As noted above, at the close of evidence, Jackie submitted proposed jury instructions. His instructions included multiple lesser included offenses of burglary in the first degree. The trial court instructed the jury on two of his requested lesser included offenses: burglary in the second degree and criminal trespass in the first degree. However, it did not instruct the jury on burglary in the third degree as Jackie requested.

Under Kentucky Revised Statute (KRS) 511.020(1),[2]

[a] person is guilty of burglary in the first degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime:

(a) Is armed with explosives or a deadly weapon; or

---

[2] KRS 511.020 was amended this year and became effective on July 14, 2022. Subsection 1 of KRS 511.020 was substantively unchanged by the 2022 amendments, and the changes to the statute are not relevant to this analysis.

(b) Causes physical injury to any person who is not a participant in the crime; or

(c) Uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime.

The instructions given to the jury specified that the jury was to find Jackie guilty if it believed "[t]hat while in the home he was armed with a gun that was a deadly weapon [as defined by another instruction]."

Under KRS 511.040(1),[3] "[a] person is guilty of burglary in the third degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a building." Notably, burglary in the third degree does not require that the perpetrator be armed with a deadly weapon. Jackie asserts that the trial court erred in failing to instruct the jury on this lesser included offense because the jury could have believed that he was not armed with a deadly weapon when he burglarized Tara's home.

This argument, however, is unpersuasive. Insufficient evidence was admitted to justify the giving of an instruction on burglary in the third degree on the basis that Jackie was not armed when he committed the burglary. The jury heard extensive testimony from Tara that Jackie was armed when he broke into her home and raped her. Tara further testified that she was with Jackie when he returned the gun to Michael Staples, the person from whom he had borrowed it. Tara's testimony was corroborated by the testimony of Staples

---

[3] KRS 511.040 was amended this year and became effective on July 14, 2022. Subsection 1 of KRS 511.040 was substantively unchanged by the 2022 amendments, and the changes to the statute are not relevant to this analysis.

himself, who said he had lent Jackie a gun the day before the crime was committed and received it back the next day. The jury heard no evidence to contradict Tara's or Staples's testimony regarding the gun. Thus, the evidence presented did not justify an instruction on burglary in the third degree. No reasonable juror could have acquitted Jackie on burglary in the first degree and yet still found him guilty of burglary in the third degree. Therefore, the trial court did not abuse its discretion in refusing to instruct the jury on burglary in the third degree.

### B. Sentencing

Jackie further argues that the trial court made two errors related to his sentencing, both stemming from the trial court's dismissal of Juror 8 during penalty phase deliberations. First, Jackie alleges that the trial court erred by excusing Juror 8. Second, Jackie argues that the trial court erred in failing to declare a mistrial following the juror's excusal. Because the juror excusal issue is dispositive, we discuss it first. To understand Jackie's arguments regarding sentencing, we first describe the facts surrounding it in greater depth.

After the jury found Jackie guilty and heard evidence in the penalty phase, it began deliberations. One juror, Juror 8, informed the trial court that she no longer wanted to deliberate. The trial court asked her about this, and she ultimately said that she could not participate because it was too difficult to make a decision and the responsibility of sentencing Jackie was too much. The trial court dismissed Juror 8 over the objections of both the Commonwealth and the defense. However, that left the jury with only 11 members. Therefore,

the judge offered Jackie a choice: either (1) waive his right to a 12-person jury and allow the 11 to decide his sentence, or (2) place the fixing of his sentence on the judge. Jackie objected to the 11 jurors, so the trial court ultimately decided his sentence. The judge sentenced Jackie to 30 years in prison.

The Sixth Amendment to the United States Constitution and Section 11 of the Kentucky Constitution guarantee a criminal defendant the right to trial by a fair and impartial jury. Challenges to a juror "must be made before the jury is sworn[;]" however, a "prospective juror may be challenged after being accepted" if "the court for good cause permits it." RCr 9.36(3). Kentucky Rule of Criminal Procedure (RCr) 9.32(1) "recognizes that it sometimes 'become[s] necessary to excuse a juror' . . . . for cause during trial once it becomes evident that the juror is not qualified to sit." *Nunley v. Commonwealth*, 393 S.W.3d 9, 14 (Ky. 2013). "[W]hat technically happens when the juror is disqualified, even in the middle of trial, is that he is struck for cause." *Id.*

RCr 9.36(1) provides "the standard by which trial courts are to decide whether a juror must be excused for cause." *Sturgeon v. Commonwealth*, 521 S.W.3d 189, 193 (Ky. 2017). That rule states, "When there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." RCr 9.36(1). In *Sturgeon*, we explained that "regardless of the juror's *actual* ability to render a fair and impartial verdict, Rule 9.36(1) mandates the removal of a juror if there is merely 'a reasonable ground to believe' that he cannot render a fair and impartial verdict." *Id.* at 194. "'[A] reasonable ground to believe' a

10

prospective juror cannot be fair and impartial is not tantamount to an actual finding that the juror cannot be fair and impartial." *Id.* We have further explained that "where questions about the impartiality of a juror cannot be resolved with certainty, or in marginal cases, the questionable juror should be excused." *Ordway v. Commonwealth*, 391 S.W.3d 762, 780 (Ky. 2013).

"A trial court's decision whether to remove a juror from a panel that has already been seated is reviewed for an abuse of discretion." *Lester v. Commonwealth*, 132 S.W.3d 857, 863 (Ky. 2004) (citations omitted). A trial court abuses its discretion only where its decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945 (citations omitted).

During penalty phase deliberations, Juror 8 informed a court bailiff, who in turn informed the trial judge, that she no longer wanted to continue deliberating. The judge then spoke with Juror 8 in his chambers with both defense counsel and the Commonwealth's Attorney present. The following exchange occurred.

> Judge: Anytime situations like this happen, and this isn't the first time something like this has occurred, I've got to always personally ask myself and not take it from the bailiff, what the situation is. And I understand that you would like to be excused from the further deliberations, is that right?
>
> Juror 8: [Indicates agreement]
>
> Judge: Okay. And I can tell you're rather emotional. So, if you want to tell us why, that's fine, but if you don't want to, that's okay too. Okay? All right. Do you all have any questions or anything else?

11

Commonwealth's Attorney (CA): I mean, I, I hate to, I really don't want to make anything worse on you than it is, okay, but do you really think you can't sit through it anymore and come to a verdict?

Juror 8: I don't want to be a part of it anymore. I don't, just 'cause, you know, I just, I see both sides. I do.

Judge: Okay.

CA: So, and I really, honestly, not trying to pry, it's just we have to do the best we can to figure out, you know.

Juror 8: No, yeah, yes ma'am

CA: Okay.

Juror 8: I understand that. I do.

CA: Is it just so tough because, and I don't want to know anything you guys are talking about, at all. But is it just like it's getting hard to make a decision?

Juror 8: That, and then like, you know—

CA: And please don't tell us anything about deliberations.

Juror 8: No, no I won't.

CA: Okay.

Juror 8: That, and then like, you know, it's just like a repetitive mistake has been made. And like you know lives is getting destroyed, I'm considering the fact that like you got the victim and then you got a family man with kids and somebody that made a mistake and, it just, you know, a life is getting ready, two lives, a lot of, plenty of lives is getting destroyed, you know. And then you got her having to deal with it for the rest of her life, he's dealing with it for the rest of his life, and it's just—

CA: It's a lot to handle.

Juror 8: It is.

CA: It's a lot of responsibility.

Juror 8: Yes, and like this man took me—it's like this man's life is in our hands.

Judge: Yeah, here's an important question, I guess is that, if you are the only juror who wants to do one thing and the rest of them want to do something else, it's kind of hard for me to say, I'd rather say we have a deadlocked jury than I would, you know, put somebody else in. I mean, if your conviction is one way, and their conviction is totally different, I'd have a tough time, but if you have not, I mean, excusing you, but if you have not made up your mind, you're still deliberating with them and it's a tough decision on your part, I can—that's okay.

Juror 8: No, I mean, I think it's fair to say like, I mean, facts are facts. And like a lot of facts was proven, and it's like some facts was just never brought up. Some situations weren't brought up. So, you know, it's, you can't do nothing, but you don't want to speculate. And then you don't want to assume something. You gotta use what was brought to the table, you know, so that's why, everything that's brought to the table and that's what it is. That's what we gotta make that decision off of, but it's just—I just—

Judge: Let me ask you this. Don't tell me what it is, but have you already made a decision on what you think the sentencing should be?

Juror 8: No.

Judge: Okay. So, you're still deliberating, and it's tough for you to make a decision. And I got a feeling that because it's so emotional that some of these things may be close to home.

Juror 8: I try to keep my, you know, my feelings out of it. It's just, I don't know.

The judge then excused Juror 8 from the room. The following exchange occurred between the judge and the attorneys.

Judge: Here's my view: if she has made up her mind, and she's having a hard time getting the others to go along or they're pressuring her too much, I don't think that's too much of a good reason. I think I need to go in and say that if you cannot reach a decision, then tell us. But I don't think that's the way it is.

CA: It doesn't sound like she has made up her mind.

Judge: No. And she's also, I think, addressing some issues that are hitting, coming, too close to home, you might say. I'm not so sure she's able to reach a decision. You know, we address those issues beginning during voir dire, but sometimes things are too personal, and they just don't talk about it.

The parties then took a break to conduct independent research on the issue.

After returning, the following conversation took place.

CA: I agree with you, judge. I think you do need to go back in there and advise them to keep trying and then see what happens after that. And if they say they can't come back, but I think just because—I understand she's struggling, but you know, that happens. They're making tough decisions every day.

Judge: I think it's too much of a burden on her. I do. I don't think it's right for me to force someone who is in emotional turmoil—

CA: I get that, but they haven't said, "We can't come to a decision yet." So, can you really take it away from them?

Judge: I'm not taking it away from them. I'll bring in the alternate juror.

CA: Oh, okay.

Judge: I've already called, and she's waiting.

CA: Oh, okay. That's fine. I don't care now. If that's something you can do.

Defense Counsel (DC): I was actually going to object because she seems uncertain about the outcome.

Judge: Oh, so you would actually like her to stay on?

DC: I would. I actually want someone that's really going to put that much thought into it.

CA: I just want to keep the decision with them. That's really my ultimate—

Judge: Here's the quandary. If over your objections or over yours, if I bring in the alternate juror, then there's a, it stands that, you

know, it would go up to appeal. Regardless it is probably going to go up anyway because of the situation. She is in emotional turmoil. This is very difficult for her. I could either bring in the alternate juror and let them go on—

DC: Isn't this a procedural matter? If you were to do that, wouldn't you have to go through and present everything again from the sentencing phase?

Judge: Well, they would have to start over and discuss everything.

DC: No. But she wasn't—

Judge: She wasn't in the guilt—

DC: No, she wasn't there.

CA: She wasn't in the penalty.

DC: So, she didn't hear any of that.

Judge: No, but she saw the whole trial. She saw the whole trial. You want me to force her to go back in?

DC: I mean, honestly, I think for his benefit, I think I have to.

Judge: And you don't care?

CA: I'll leave it to your discretion. I just think it is still a jury question whatever you decide to do, your honor.

Judge: All right. Let's talk to [Juror 8].

Juror 8 then came back into the room. The following brief conversation took place between she and the judge before the judge ultimately excused her from the jury.

Judge: [Juror 8], have a seat again. Let me ask you this. You're not, I mean, if you just said, "I'm going," there's no bailiff that's gonna stop you. You're not gonna be charged with anything. You won't serve any time. You know. But if you say, "I cannot, I just cannot do this," and you know, you leave, you leave, okay? That's all there is to it. I'm not gonna force you to do something that you

15

can't do. But I'm asking you this question: if I ask you to go back in there, what would you tell me?

Juror 8: I can't.

Judge: Okay, you just can't do that. Okay. All right. That's all I need to know. I'm not going to force you to that, obviously. That's crazy because you can't force somebody to deliberate, objectively, when they're under such emotional turmoil, as I can tell you are. But I also think, I got the impression that you haven't made a decision on the sentencing. You know, if you had already made the decision, it'd be easy for me. I'd go in and say, "Well, there can't be any, the jury, you don't have a meeting of the minds. I don't think there ever will be and so forth," okay? So, I'm going to, over both your objections, I'm gonna go ahead and release you. Okay? Excuse you, rather, is the word. And I appreciate the service that you gave us today. I mean it's not been easy. . . .

Following Juror 8's excusal, the judge and the attorneys discussed how to proceed. The judge ultimately gave Jackie two options. He could either waive his right to a jury of 12 people and allow the remaining 11 jurors to decide his sentence, or he could refuse to waive this right, and the judge would sentence him. Jackie refused to waive his right to a jury of 12 people, thus leaving the judge to decide his sentence. During this conversation, the judge reiterated: "I did not believe forcing [Juror 8] to go in there would have been an appropriate deliberation . . . she would not have been able to process things appropriate or anything else . . . she certainty would not have done it freely . . . And I think that she was under duress and that's why I did that."

This Court acknowledges the difficult and essential role that jurors play in our trial courts. Without thoughtful and engaged jurors, our system would suffer immensely. This means that jury service—especially in serious criminal cases such as the one at bar—may take a personal, emotional toll. Juror 8, in

16

many ways, exemplified both this toll *and* its necessity: in her discussion with the trial court, she acknowledged the difficulty associated with handing down a sentence that would affect the lives of not only the victim, but the defendant, and indeed the community surrounding both parties. She was careful to avoid speculations and assumptions in her weighing of the evidence she was provided. She saw both sides, and because she took the decision seriously, it caused her emotional turmoil. This Court greatly appreciates jurors who take up their responsibility so earnestly and critically.

While we recognize Juror 8's anguish as sincere, our review of the trial court's decision to excuse her cannot rest solely on her evident emotional state. Instead, we must look to the process for excusal employed by the trial court. That court was presented with a uniquely difficult quandary: under what circumstances, and how, should a trial court excuse a juror during penalty phase deliberations?

As we note above, the rule for excusing an already-seated juror allows for removal when the trial court has reasonable ground to believe that the juror cannot be fair or impartial. *See* RCr 9.36(1); *Sturgeon,* 521 S.W.3d at 194. A juror's inability to fairly deliberate is, thus, sufficient cause for excusal. *See also Jackson v. Commonwealth,* 392 S.W.3d 907, 913 (Ky. 2013); *Robert v. Commonwealth,* No. 2014-SC-000284-MR, 2015 WL 6584641, at *2–3 (Ky. Oct. 29, 2015). Being fair includes being able to discuss and deliberate with fellow jurors. To determine whether a juror is affected in such a way that would impair their fairness or impartiality, the trial court should engage in a

17

searching colloquy with the juror. *See Crossland v. Commonwealth*, 291 S.W.3d 223, 227 n.7 (Ky. 2009), *superseded on other grounds by* Supreme Court Order 2010-09 (amending RCr 9.32). Here, the judge questioned Juror 8 solely regarding her emotional capacity to make a decision. Juror 8 did not state or imply at any point during that limited colloquy that she was incapable of being fair or impartial; in fact, the source of Juror 8's distress *was* her ability to see both sides.

There was therefore no indication of unfairness or partiality. "In other words, there appeared to be no inherent statutory or constitutional reason why the juror could not serve . . . , meaning that the issue should have been fleshed out by the trial court." *Id.* Perhaps, through a more searching inquiry, the trial court could have established the juror's sincere inability to deliberate fairly and impartially. However, without doing so this Court is left with an inadequate record to review her inability or unwillingness to continue deliberating. The nature of a sufficient probing must be more than what was done in this case.

Excusing a juror during deliberations is not an easy decision, and it should never be taken lightly. We hope that judges will not often be confronted with the situation discussed within this Opinion. If circumstances repeat, however, judges should inquire further regarding a juror's ability to deliberate fairly. Additionally, we see no reason why a jury should not be permitted to take a break to defuse what may be an incredibly stressful or emotional atmosphere hindering deliberations. A judge may also encourage the juror to continue to deliberate, reminding the juror that they have a "duty to consult

18

with [the other jurors] and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment." RCr 9.57(1)(b). While these examples are not exhaustive—and we recognize that each circumstance may require a different solution—we hope that these options provide some guidance.

Even if this Court were to hold that a statement by a juror that they "can't" continue deliberating could rise to the level of cause allowing for excusal, in the case at bar, Juror 8's statements to that effect would still be insufficient. As is evident from the transcript above, Juror 8's answers were heavily guided by the suggestions and questions of the judge. Only after the judge stated, "If you say, 'I cannot, I just cannot do this,' . . . I'm not gonna force you to do something that you can't do. But I'm asking you this question: if I ask you to go back in there, what would you tell me?" did she respond, "I can't." In framing his inquiry as such, the judge told the juror exactly what she needed to say to be excused. Her attestation of inability was therefore tainted by the judge's own inquiry. *Jackson*, 392 S.W.3d at 914.

Thus, the trial court erred by failing to conduct a sufficiently searching inquiry to determine the juror's potential inability to be fair or impartial. Seeing no such unfairness or partiality and in the absence of other cause, the trial court abused its discretion by excusing the juror. Therefore, we vacate Jackie's sentence and remand to the trial court for a new penalty phase. Because we vacate Jackie's sentence on the grounds stated above, we do not address Jackie's remaining arguments regarding the judge's imposition of the sentence.

19

On remand, at a minimum, the new sentencing jury should

> have read to it (a) the charges from the indictment of which the defendant was found guilty; (b) any charge of which the defendant was found guilty which was a lesser-included offense to a charge set out in the indictment; (c) the jury instructions given by the trial court at the guilt phase; and (d) the jury's verdict.

*Boone v. Commonwealth*, 821 S.W.2d 813, 814 (Ky. 1992). We have previously recommended, when remanding on sentencing alone, that "each [side] could read a concise summary of the evidence which it offered and which was admitted at the guilt phase of the earlier trial. Similarly, the closing arguments of both sides from the guilt phase could be read or projected." *Id.* at 814–15. However, with the proliferation of video and audio recorded proceedings, best practice would now be for the new sentencing jury to watch the entire guilt phase of the earlier trial. We understand that trial courts may handle this differently across the Commonwealth, and that exceptions may be necessary in some cases. We trust the sound discretion of the trial court in choosing whether to deviate from this best practice. We recognize this procedure may place a heavier burden on trial courts and resentencing juries, and we therefore emphasize the importance of a sufficient inquiry before excusing a juror for cause during penalty phase deliberations.

### III.    CONCLUSION

For the foregoing reasons, we affirm the conviction, vacate the sentence, and remand to the trial court for proceedings consistent with this opinion.

All sitting.  All concur.

20

COUNSEL FOR APPELLANT:

Aaron Reed Baker
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Jeffrey Allan Cross
Assistant Attorney General